NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3097-18

MACK-CALI REALTY
CORP., CAL-HARBOR
V URBAN RENEWAL
ASSOCIATES, LP,
CAL-HARBOR VII URBAN
RENEWAL ASSOCIATES, LP,
ROSELAND RESIDENTIAL
TRUST, GARY WAGNER, IVAN
BARON, H.P. ROOSEVELT
URBAN RENEWAL COMPANY,
LLC, CAMBRIDGE CORPORATE
SERVICES, INC., LOCAL 621,
UNITED CONSTRUCTION
TRADES INDUSTRIAL UNION,
 LOCAL 365, UNITED
EMPLOYEES OF SERVICE
WORKERS, SP PLUS
CORPORATION, LOS CUERNOS
CORP., EXCHANGE PLACE
ALLIANCE DISTRICT
MANAGEMENT CORPORATION,
SPARTAN SECURITY SERVICES,
INC., NEW JERSEY BUSINESS &
INDUSTRY ASSOCATION, and
HUDSON COUNTY CHAMBER
OF COMMERCE & INDUSTRY,

        Plaintiffs-Appellants,

v.

STATE OF NEW JERSEY, CITY
OF JERSEY CITY, MAYOR AND

> **APPROVED FOR PUBLICATION**
>
> **February 16, 2021**
>
> **APPELLATE DIVISION**

COUNSEL OF THE CITY OF
JERSEY CITY, DONNA MAUER,
in her Official Capacity as Director
and Chief Financial Officer of the
City of Jersey City, and BRIAN
PLATT, in his Official Capacity
as Business Administrator of the
City of Jersey City,

     Defendants-Respondents.

_____

CITY OF NEWARK,

     Intervenor-Respondent.

_____

> Argued October 19, 2020 – Decided February 16, 2021
>
> Before Judges Messano, Hoffman, and Suter.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4903-18.
>
> Clark E. Alpert and Stephen J. Edelstein argued the cause for appellants (Weiner Law Group, LLP, attorneys; Clark E. Alpert, of counsel and on the briefs; Stephen J. Edelstein, Richard L. Rudin, Donald A. Klein, and Paul S. Grossman, on the briefs).
>
> Jean P. Reilly, Assistant Attorney General, argued the cause for respondent State of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jean P. Reilly, of counsel and on the brief; Jamie M. Zug, Eileen W. Siegeltuch, Michael J. Duffy, Heather Lynn Anderson, and Miles Eckardt, Deputy Attorneys General, on the brief).

Vito A. Gagliardi, Jr., argued the cause for respondents City of Jersey City, Mayor and Council of the City of Jersey City, Donna Mauer, and Brian Platt (Porzio, Bromberg & Newman, PC, attorneys; Vito A. Gagliardi, Jr., of counsel and on the brief; Jeffrey M. Pypcznski, Tanya Y. Shah, and Thomas J. Reilly, on the brief).

Cheyne R. Scott argued the cause for intervenor-respondent City of Newark (Chasan, Lamparello, Mallon & Cappuzzo, PC, attorneys; Cheyne R. Scott, of counsel and on the brief; Cindy Nan Vogelman, on the brief).

Craig A. Long argued the cause for amici curiae New Jersey Education Association and Jersey City Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, PC, attorneys; Richard A. Friedman, of counsel; Craig A. Long, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiffs — real estate developers and urban renewal entities in Jersey City; business owners with operations in Jersey City; labor unions, which members provide personnel and services to Jersey City businesses and some of which have members that live in Jersey City; and business trade associations — challenged Jersey City Ordinance 18-133 (the Ordinance), which imposed a payroll tax of one-percent of an employer's payroll, but exempted from the calculation employees who were residents of Jersey City (the City). Plaintiffs filed a verified complaint and order to show cause seeking to declare the

Ordinance and certain 2018 amendments (Chapter 68)[1] to the Local Tax Authorization Act (LTAA), N.J.S.A. 40:48C-1 to -42, violated the United States and New Jersey Constitutions. They also alleged the Ordinance was ultra vires, void for vagueness and violated contractual rights certain plaintiffs had under tax abatement agreements with the City pursuant to the Long-Term Tax Exemption Law (LTTEL), N.J.S.A. 40A:20-1 to -22.

After considering oral argument, the judge denied plaintiffs' request for a preliminary injunction and scheduled a dispositive nontestimonial hearing. The City and defendant State of New Jersey moved to dismiss the complaint.[2] The judge granted amicus status to the New Jersey Education Association and the Jersey City Education Association (collectively, NJEA). Plaintiffs cross-moved for summary judgment.

In a comprehensive written decision, the judge granted defendants' motion to dismiss and denied plaintiffs' cross-motion for summary judgment. He concluded plaintiffs failed to join an indispensable party, the City of Newark (Newark), and, on the merits, the judge determined the statutory amendments were constitutional, and the Ordinance was a valid, constitutional

---

[1] This is a reference to the amendments' session law designation, L. 2018, c. 68.

[2] Individual City officials were also named as defendants in their official capacities. We include them collectively in our references to the City.

exercise of the City's authority. The judge entered conforming orders, and this appeal followed; we subsequently granted Newark's motion to intervene, and NJEA's motion to appear as amicus.

Plaintiffs reprise their arguments before us. They contend that Chapter 68, which authorized enactment of the Ordinance, in conjunction with 2018 amendments to the School Funding Reform Act of 2008 (SFRA), N.J.S.A. 18A:7F-43 to -63, violates the Education Clause of our State constitution, N.J. Const. art. VIII, § 4, ¶ 1, as interpreted by the Court and reaffirmed most recently in Abbott v. Burke, 199 N.J. 140 (2009) (Abbott XXI), and Abbott v. Burke, 206 N.J. 332 (2011) (Abbott XXII). Plaintiffs also argue Chapter 68 is unconstitutional special legislation, N.J. Const. art. IV, § VII, ¶ 9; violates the constitutional requirement that property be taxed pursuant to general and uniform laws, N.J. Const. art. VIII, § 1, ¶ 1; and violates the constitutional prohibition on using payroll taxes for non-employee benefit purposes, N.J. Const. art. VIII, § 2, ¶ 8. They argue enactment of Chapter 68 was arbitrary, capricious, and unreasonable.

Plaintiffs further contend that Chapter 68 and the Ordinance violate their federal constitutional rights under the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, and the

Privileges and Immunities Clause of the United States Constitution. U.S. Const. art. IV, § 2, cl. 1.

Plaintiffs also reassert their claim that the Ordinance was void for vagueness and ultra vires. Finally, they contend the judge misapplied the standards governing a motion to dismiss under Rule 4:6-2(e) and erred in dismissing the complaint for lack of an indispensable party, i.e., Newark.

The State, City and Newark oppose these contentions and urge us to affirm the judge's orders. The NJEA similarly supports this position as amicus.

## I.

We provide some historical background regarding the LTAA, SFRA, amendments to both enacted in 2018, and relevant provisions of the Ordinance.

## A.

As originally enacted in 1970, the LTAA granted municipalities of a certain population the authority "to enact an ordinance . . . imposing any of the taxes" thereafter provided in the statute. N.J.S.A. 40:48C-1.[3] One tax

---

[3] Only Newark met the then-existing population threshold. See City of Jersey City v. Farmer, 329 N.J. Super. 27, 31–32 (App. Div. 2000). In 1990, the Legislature amended N.J.S.A. 40:48C-1 to reduce the population threshold to 200,000, where it remains today. L. 1990, c. 9. As a result, the City joined Newark as the only municipalities authorized to enact a payroll tax. Farmer, 329 N.J. Super. at 32. The City, however, did not adopt a payroll tax until 1995, effective January 1,

authorized by the LTAA was "an employer payroll tax <u>for general municipal purposes</u> . . . at a rate of . . . one percent of the employer's payroll."  N.J.S.A. 40:48C-15(a) (1970) (emphasis added).  Chapter 68 significantly amended this and other provisions of the LTAA.

First, Chapter 68 authorized adoption of an ordinance that "provide[d] . . . the employer payroll tax shall not apply to the remuneration paid . . . to employees who are residents of the municipality."   N.J.S.A. 40:48C-15(c).  Second, Chapter 68 expanded the permissible use of payroll tax revenues by allowing a municipality to impose a payroll tax not only "for general municipal purposes," but also "<u>for the purposes set forth in subsection d. of this section</u>." N.J.S.A. 40:48C-15(a) (emphasis added).

Subsection (d)(1), also part of Chapter 68, provided:

> If a municipality adopts an ordinance pursuant to [N.J.S.A. 40:48C-15(a)] . . . and the municipality has a median household income of $55,000 or greater according to the . . . United States Census Bureau, all employer payroll tax revenues collected . . . pursuant to the ordinance shall be deposited into a trust fund to be used exclusively for school purposes . . . .

---

1996; by then, the Legislature had amended N.J.S.A. 40:48C-19 to retroactively preclude the City's collection of the tax, which we upheld against constitutional challenge by the City.  <u>Id.</u> at 30–31.  A provision of Chapter 68 repealed N.J.S.A. 40:48C-19, <u>see</u> <u>L.</u> 2018, <u>c.</u> 68 § 3, thereby permitting the City to enact and collect a payroll tax.

Subsection (d)(2) requires the municipality to pay over from the trust fund to its school board on a monthly basis "an amount equal to one-twelfth of the difference in State school aid provided to that school district, pursuant to [SFRA], between the current State fiscal year and State fiscal year 2018, for use in lieu of adjustment aid and all other categories of State school aid."  The balance of any payroll tax revenues collected remain in the trust fund "in the event the employer payroll tax revenues collected in a year are insufficient to pay the full amount" required under (d)(2).  N.J.S.A. 40:48C-15(d)(3).

B.

The Education Clause of our state Constitution requires the Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children . . . between the ages of five and eighteen years."  N.J. Const. art. VIII, § 4, ¶ 1.  When enacted in 2008, SFRA reflected "the State's most recent, lengthy and painstaking effort to craft a redesigned school funding formula that satisfies the constitutional standard."  Abbott XXI, 199 N.J. at 147.

SFRA uses a formula to calculate the "adequacy budget" for each school district, that, in general terms, multiplies enrollment by a "base per pupil amount" added to the costs of other necessary educational services and district-specific geographic costs.  N.J.S.A. 18A:7F-50(b); N.J.S.A. 18A:17F-51.  To

8

meet its portion of its adequacy budget, each school district must set a "general fund tax levy" in an amount equal to that district's "required local share." N.J.S.A. 18A:7F-5(b).  For most districts, the "required local share" equals the lesser of "the local share[4] calculated at the district's adequacy budget" or the district's local share from the previous year.  N.J.S.A. 18A:7F-5(b).  SFRA directs the State to remit to each school district "equalization aid" in an amount equal to the remainder after subtracting the local share from the adequacy budget.  N.J.S.A. 18A:7F-53.

For former so-called Abbott districts like the City, the required local share is calculated differently.  N.J.S.A. 18A:7F-5(b).  In addition to other forms of state aid, SFRA established "educational adequacy aid" for former Abbott districts that were spending beneath their adequacy budget and did not meet certain educational criteria.  N.J.S.A. 18A:7F-58(b).  When enacted, SFRA directed that eligible districts would take the funds received from the combination of its own tax levy and "equalization aid" received from the State, and, with minor adjustments, subtract that amount from the adequacy budget; the result was the amount of "educational adequacy aid" sent to the district. Ibid.

---

[4]  The "local share," distinct from the "required local share," considers the property values and incomes in a school district.  N.J.S.A. 18A:7F-52.

9

Separate from equalization aid, educational adequacy aid, and other categories of state aid, SFRA also allocated "adjustment aid" to ensure that, generally speaking, former Abbott districts would receive "the greater of the amount of State aid" between the amount calculated under SFRA and the amount the district had received in the prior year plus two percent. N.J.S.A. 18A:7F-58(a)(3) to (4). SFRA also included a two-percent growth limitation on the amount by which a school district could increase its budget without first obtaining approval from voters in a local election, N.J.S.A. 18A:7F-38(a),[5] and tiered growth limits on the total aid former Abbott districts could receive from the State. N.J.S.A. 18A:7F-47.[6]

The 2018 amendments to SFRA were intended to address concern that, since its inception nine years earlier, the statute "ha[d] not been fully implemented" towards its goal of distributing State school aid to districts "based on the needs of the student population and local fiscal capacity." Sponsor's Statement to S. 28 (L. 2018, c. 67). The amendments were intended to "realign[ ] the amount of State aid provided to school districts with their current needs," and to correct inequities in the amount of school aid districts

---

[5]  Initially this was a four-percent cap that applied to districts spending above adequacy, L. 2007, c. 260, §3, but in 2010, the two-percent cap was set and extended to all districts. L. 2010, c. 44, § 3.

[6]  Repealed by L. 2018, c. 67, § 8.

had been receiving.  Ibid.

In pertinent part, the SFRA amendments eliminated adjustment aid going forward and incorporated a "state aid differential" variable used to recalculate the distribution of aid more equitably.  N.J.S.A. 18A:7F-67.  The state aid differential is calculated by subtracting the district's budget-year state aid — not including any adjustment aid, educational adequacy aid, or other "non-SFRA aid" — from the prior year's total state aid — a sum that includes adjustment and non-SFRA aid.  Ibid.  Generally, districts with a positive state aid differential receive the amount of aid received in the prior year, reduced by a specified percentage that increases annually in gradual increments[7] until the excess aid is eliminated in the 2024–25 school year.  N.J.S.A. 18A:7F-68(b).[8]

The total amount of adjustment aid cut each year is added to any increase in the State's total appropriated aid for that year, and that sum is then allocated proportionately to districts with negative differentials.  N.J.S.A. 18A:7F-68(a).  The Legislature also repealed the state aid growth limitation, L. 2018, c. 67, §8, and amended the two-percent local tax levy growth limitation

---

[7]  Thirteen-percent reduction in the 2019–20 school year, 23% in 2020–21, 37% in 2021–22, 55% in 2022–23, 76% in 2023–24, and 100% in 2024–25. N.J.S.A. 18A:7F-68(b).

[8] Certain former Abbott districts and non-Abbott districts are exempt from the reductions, but those exemptions are not at issue here. N.J.S.A. 18A:7F-68(c).

in N.J.S.A. 18A:7F-38 to allow former Abbott districts to increase the amount of their general fund tax levy irrespective of the cap.  N.J.S.A. 18A:7F-38(a).[9]

It is undisputed that the 2018 SFRA amendments resulted in significant reductions in State aid to the City's school district commencing in fiscal year 2019.

## C.

Our Constitution provides that "corporations may be authorized by law to undertake . . . clearance, replanning, development, or redevelopment" of "blighted areas," and "improvements made for these purposes . . . may be exempted from taxation . . . for a limited period of time" during which the corporation's "profits . . . and dividends . . . shall be limited by law."  N.J. Const. art. VIII, § 3, ¶ 1.  The Legislature enacted the LTTEL "to encourage private capital and participation by private enterprise" in "the restoration of deteriorated or neglected properties . . . in the elimination of the blighted condition," in exchange for "special financial arrangements, including the granting of property tax exemptions."  N.J.S.A. 40A:20-2.  Among other things, the LTTEL authorized qualified "urban renewal entit[ies]" to enter into financial agreements with municipalities and conduct long-term redevelopment projects.  N.J.S.A. 40A:20-8.

---

[9] See L. 2018, c. 67, §§ 3, 8.

"Every approved project shall be evidenced by a financial agreement between the municipality and the urban renewal entity," and the agreement shall provide "[t]hat all improvements . . . in the project . . . shall be exempt from taxation." N.J.S.A. 40A:20-9(b). "During the term of any exemption, in lieu of any taxes to be paid on the . . . improvements of the project and, . . . the urban renewal entity shall make payment to the municipality of an annual service charge . . . ." N.J.S.A. 40A:20-12(b). After the exemption terminates, the improvements are taxed like any other real property improvements in the municipality. N.J.S.A. 40A:20-12(c). Several plaintiffs entered into financial agreements with the City whereby they remit an annual service charge payment in lieu of property taxes (PILOT payments) on the improvements, but not the real property, within their redevelopment projects; the assessed value of the real property is taxed like other real property in the municipality. The specific terms of these financial agreements are not in the record.

In 2018, the value of real property in the City subject to tax abatements was $320,932,804. The Education Law Center, a non-profit public interest law firm that advocates for students, reported that in the 2018–19 school year, Jersey City received State aid that exceeded the amount needed to meet its adequacy budget. However, due to the depletion of the property tax base resulting from LTTEL financial agreements, the City was underfunding its

13

local share and spending $103,749,652 below its adequacy level, or $3367 per pupil.

The City enacted the Ordinance with the stated purpose "to establish a payroll tax on the payrolls of Non-Jersey City residents for the benefit of Jersey City schools." The Ordinance became effective on January 1, 2019. See Jersey City, N.J., Code § 304-18.

The Ordinance imposed a payroll tax "equal to one percent of the employer's payroll," with those revenues to be placed in a trust fund "used exclusively for [s]chool purposes." The Ordinance further directed that "[a]ll tax revenue distributed" through the trust fund "be used in lieu of State adjustment aid and all other categories of State school aid." Id. at § 19.1(d). The ordinance provided that "[a]n employer shall incur no payroll tax relative to its Jersey City-resident [e]mployees." Id. at § 304-19(a). Consistent with the LTAA,[10] the Ordinance defined "payroll," as "the total remuneration paid by employers to employees . . . for services . . . performed within the City of Jersey City; or . . . performed outside of the City of Jersey City but . . . supervised . . . in Jersey City." Ibid.

---

[10] See N.J.S.A. 40:48C-14 (defining "[p]ayroll" for purposes of the LTAA).

II.

A.

Plaintiffs contend Chapter 68 violates the Education Clause by enabling the City to enact the Ordinance, which generates revenue used to relieve the State of its constitutional obligation to fund a thorough and efficient educational system as the Court ordered in its Abbott decisions. The motion judge rejected the argument, noting that because the City faced "extraordinary circumstances," the Legislature was justified in amending the LTAA to ensure that Jersey City raised enough revenue for its schools and avoided any budgetary shortfall.

Plaintiffs argue the judge erred, because revenue from the payroll tax was not replacing Jersey City's local share under SFRA, but, as the Ordinance itself made clear, the revenue replaced cuts in State adjustment aid. They argue that under SFRA, a district's adequacy budget and a municipality's local share are set by statutory formulae; the only variable to bridge any gap and meet the State's constitutional obligations under the Education Clause is the amount of state aid provided in a given year. In plaintiffs' view, the State is not permitted to empower a municipality to generate aid that the State is constitutionally obligated to provide pursuant to the Education Clause as construed by the Abbott cases. We disagree.

15

We set some guideposts that inform our consideration of plaintiffs' arguments. Against facial constitutional challenges, we "afford every possible presumption in favor of an act of the Legislature." Town of Secaucus v. Hudson Cnty. Bd. of Tax'n, 133 N.J. 482, 492 (1993) (citing Holster v. Bd. of Trs., 59 N.J. 60, 66 (1971)); accord Strategic Env't Partners, LLC v. N.J. Dep't of Env't Prot., 438 N.J. Super. 125, 144 (App. Div. 2014). Simply put, "the courts do not act as a super-legislature." Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222 (1985) (citing Burton v. Sills, 53 N.J. 86, 95 (1968)). "Only a statute 'clearly repugnant to the constitution' will be declared void." Secaucus, 133 N.J. at 492–93 (quoting Newark Superior Officers, 98 N.J. at 222–23). Reviewing courts are "not limited to the stated purpose of the legislation and 'should seek any conceivable rational basis'" to uphold it. Strategic Env't, 438 N.J. Super. at 145 (quoting Secaucus, 133 N.J. at 494–95). A statute will not be found "facially unconstitutional if it operates constitutionally in some instances." Whirlpool Props., Inc. v. Dir., Div. of Tax'n, 208 N.J. 141, 175 (2011) (quoting Gen. Motors Corp. v. City of Linden, 150 N.J. 522, 532 (1997)).

"[T]he burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision." Newark Superior Officers, 98 N.J. at 222 (citing Bd. of Educ. v. Caffiero, 86

N.J. 308, 318 (1981)). That burden is onerous. See, e.g., In re P.L. 2001, Chapter 362, 186 N.J. 368, 392 (2006) ("[W]e will not declare void legislation 'unless its repugnancy to the Constitution is clear beyond a reasonable doubt.'" (emphasis added) (quoting Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 388 (1959))). These same principles apply to our review of a challenge to the constitutionality of an ordinance. Singer v. Twp. of Princeton, 373 N.J. Super. 10, 19–20 (App. Div. 2004). Lastly, because plaintiffs challenge the constitutionality of tax legislation, we recognize that, "in the field of taxation, the Court has accorded great deference to legislative judgments." Secaucus, 133 N.J. at 493 (citing McKenny v. Byrne, 82 N.J. 304, 314 (1980)).

We agree with plaintiffs that the purpose of the Ordinance, enabled by Chapter 68, was to supplement the City's revenue available for school purposes. However, plaintiffs leap from the ineluctable conclusion that payroll tax revenues under the Ordinance supplemented municipal, not State, revenues to a wholly unsupportable result, i.e., that the Ordinance and Chapter 68 violate the Education Clause.

In Stubaus v. Whitman, the plaintiffs challenged the constitutionality of a predecessor to SFRA, arguing the funding formula's "disparate tax burdens constitut[ed] violations" of the Education Clause. 339 N.J. Super. 38, 44 (App. Div. 2001). Relying on the Court's interpretation of the Education

17

Clause in Abbott's predecessor litigation, Robinson v. Cahill, 62 N.J. 473 (1973), we noted that "taxpayer equality" was "not encompassed within the . . . constitutional mandate." Id. at 54. Because the Education Clause "does not protect taxpayers," the plaintiffs' arguments were "more appropriately . . . made to the Legislature." Id. at 56. In this case, the Legislature has acted; it passed Chapter 68 to permit the City to supplement its revenues and dedicate them for school purposes. We fail to see how plaintiffs, none of whom represent the interest of the City's schoolchildren, are positioned to challenge whether the Ordinance or Chapter 68 violates the Education Clause.

To overcome this obvious impediment, plaintiffs contend that to comply with the Court's Abbott line of cases, the State must enforce the SFRA funding formula without resort to other legislative remedies. They assert the Court "made it crystal clear that . . . the State is not permitted to rely on outside sources instead of funding its share," emphasizing that in Abbott XXII, the Court rejected the argument "that the availability of certain non-SFRA funds [could] be used to deflect the State's responsibility for the provision of a constitutionally mandated, adequately funded thorough and efficient system of education." (citing Abbott XXII, 206 N.J. at 364). A closer examination reveals the fallacy of this argument.

The Court made clear early on that "what a thorough and efficient education consists of is a continually changing concept," and that it may be necessary for the State to supplement poorer districts' financing to address educational disparities between districts. Abbott v. Burke, 119 N.J. 287, 303, 319–20 (1990) (Abbott II). The Court did not mandate any specific remedy and expressly held it was ultimately the responsibility of the Legislative and Executive branches to adopt a "comprehensive remedy." Abbott v. Burke, 149 N.J. 145, 189 (1997) (Abbott IV). The Legislature crafted such a remedy with SFRA, leading the Court to release the State from its prior enforcement orders. Abbott XXI, 199 N.J. at 238–39.

Abbott XXII provides no support for plaintiffs' argument. There, the Court specifically found that the State had "made a conscious and calculated decision to underfund the SFRA formula" in its annual appropriations, and the alternative non-SFRA funding the State pointed to "was insufficient to fill the gaps left by the reductions in state aid in the individual Abbott districts." 206 N.J. at 359, 365. The overall budgetary shortfall of $1.6 billion in that case was "spread across various SFRA aid categories, including . . . [e]qualization [a]id." Id. at 346.

Here, the purpose of expanding the payroll tax was to offset the shock from cuts in adjustment aid to the City's school district that the Legislature

19

determined were necessary to avoid continuation of historic overfunding at the expense of other, underfunded districts. The Court's admonition in Abbott XXII that the State could not rely on non-SFRA funds to avoid their constitutional obligation was premised on the fact that the State was not meeting its obligation under SFRA and was leaving former Abbott districts underfunded, a factual premise absent here. Nothing in Abbott XXII suggests the Education Clause prohibits the Legislature from providing a municipality with other revenue-raising tools it may employ to supplement its share of school costs associated with providing its children with an adequate education.

B.

Plaintiffs alleged that Chapter 68 was unconstitutional special legislation. See N.J. Const. art. IV, § VII, ¶ 9(6),(7) ("The Legislature shall not pass any private, special or local laws" for certain purposes, including laws "[r]elating to taxation or exemption therefrom," or "[p]roviding for the management and control of free public schools."). The motion judge relied heavily on our decision in Farmer, reasoning that if the prior version of the LTAA permitted imposition of a payroll tax when the statute only applied to Newark, adding eligibility for the City did not render the statute unconstitutional, especially given the City's unique fiscal struggles. He noted

20                                                                   A-3097-18

Newark and Jersey City had the largest student populations in the State, and the proliferation of PILOT agreements entered into by the City reduced its ability to meet its "local fair share for school funding" because although the agreements spurred development, they "depleted [the City's] property tax revenues and [left it] struggling to fund [its] public schools."

The Court has "established a three-part test to determine whether a statute constitute[s] special legislation."  Secaucus, 133 N.J. at 494 (citing Vreeland v. Byrne, 72 N.J. 292, 300–01 (1977)).

> [T]he method of analysis is this: we first discern the purpose and object of the enactment.  We then undertake to apply it to the factual situation presented.  Finally we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.
>
> [Ibid. (alteration in original) (quoting Vreeland, 72 N.J. at 300–01).]

"[T]he Legislature has wide discretion in determining the perimeters of a classification and an adequate factual basis for the legislative judgment is presumed to exist."  Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 18 (App. Div. 2012) (alteration in original) (quoting N.J. State Bar Ass'n v. State, 387 N.J. Super. 24, 52 (App. Div. 2006)).  Population has long been considered a valid criterion on which the Legislature can rely in making a statutory classification.  See Twp. of Mahwah v. Bergen Cnty. Bd. of Tax'n, 98

N.J. 268, 287 (1985) ("[U]nder the law of the State of New Jersey population is generally accepted as a means of classification."); Newark Superior Officers, 98 N.J. at 225 ("Statutes relating to city government classified by population are generally upheld.").

Plaintiffs argue that the 2018 SFRA amendments resulted in aid cuts to more than 170 school districts, some of which lost a greater percentage of their aid than did the City. Plaintiffs contend the legislative classification was arbitrary because only Jersey City was singled out to receive favorable replacement aid via a payroll tax. They also contend that the prospect of any other cities ever qualifying to benefit from Chapter 68 is remote.

To some extent, plaintiffs' argument posits an incomplete classification scheme. The LTAA permits all municipalities with more than 200,000 residents to impose a payroll tax. Under the Vreeland test, the Legislature reiterated this as an express purpose of Chapter 68. See Assembly Budget Committee Statement to A. 4163 (June 18, 2018) (noting purpose of legislation was to "allow any municipality having a population over 200,000 to impose and collect an employer payroll tax."). The Legislature then created a sub-classification, evidencing its intent that a municipality eligible to impose a payroll tax, and that also met the median household income requirement, was required to "use employer payroll tax revenues for school purposes," which

"would help offset certain reductions in State school aid" brought about by the SFRA amendments. Ibid. The Legislature enacted the 2018 SFRA amendments simultaneously with Chapter 68, without which Chapter 68 would not have gone into effect. See L. 2018, c. 68, § 4 (making Chapter 68 effective upon enactment of the SFRA amendments). In short, the two pieces of legislation were a coordinated response by the Legislature that recognized the drastic effects the SFRA amendments would have on the City.

Currently, it is true that no other municipality in the State is "similarly situated" to Jersey City and Newark, which are unique with respect to the size of their populations. Vreeland, 72 N.J. at 299. See Newark Superior Officers, 98 N.J. at 220 (upholding statute granting only mayors of cities of the first class the power to appoint police chiefs). More directly, we have already held "in the case of the payroll tax, there is an obvious State interest in strictly limiting the municipalities that collect such a tax." Farmer, 329 N.J. Super. at 42. These precedents support the rationality of the population-based statutory classification employed by Chapter 68.

To the extent a municipality is "singled out" by the median income classification, it is Newark; yet Newark urges us to affirm the orders under review. Newark still is permitted to continue using the revenue from its payroll tax "for general municipal purposes," as the LTAA had authorized it

alone to do for five decades. N.J.S.A. 40:48C-15(a). Regarding the LTAA, we have already held that the Legislature had a rational basis to treat Newark differently than other municipalities given Newark's long history of reliance on the payroll tax. Farmer, 329 N.J. Super. at 46.

Newark currently does not have a median household income of $55,000 or greater. However, the wealth and income within a school district have long been variables used by SFRA to calculate the amount municipalities must raise through a general tax levy. N.J.S.A. 18A:7F-52. The legislative decision to authorize a different kind of tax levy to fund schools may rationally vary depending on district wealth, and it was not irrational for the Legislature to decide that a municipality with a greater median income should be limited in the permissible uses of any payroll tax imposed.

> [O]ur Supreme Court has emphasized "the long established principle of deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution . . . [and] the equally-settled doctrine that the means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity."
>
> [Farmer, 329 N.J. Super. at 46 (second alteration in original) (quoting Roe v. Kervick, 42 N.J. 191, 229 (1964)).]

It is not for us to dispute the wisdom of the Legislature's choice.

Finally, contrary to plaintiffs' claim, this case is distinguishable from Secaucus, 133 N.J. at 498–99, where there was no possibility any other municipality would ever qualify for the tax exemption at issue. Here, any municipality that exceeds the neutral population threshold in the future is authorized to impose the payroll tax, N.J.S.A. 40:48C-1, and whether the school trust fund requirement is triggered will depend on the neutral median income criterion. N.J.S.A. 40:48C-15(d)(1). Chapter 68 contained no provision blocking the admission of other municipalities into the classification scheme.

C.

Turning to the balance of plaintiffs' contentions that rely upon provisions of our State Constitution, the urban renewal entities contend the judge erred in dismissing claims that the Ordinance violated the Uniformity Clause. That provides, "Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein . . . ." N.J. Const. art. VIII, §1, ¶ 1(a). By its terms, the provision concerns real property and the "limits on the Legislature's ability to classify real property for purposes of taxation." Gen. Motors, 150 N.J. at 526.

A-3097-18

The motion judge held that because the Uniformity Clause speaks only to the taxation of real property, the City's payroll tax did not violate this provision. On appeal, plaintiffs appear to argue that the payroll tax violates the Uniformity Clause because it supplements the City's property tax levy under SFRA with funds raised from private businesses, some of whom own real estate in the City, through the payroll tax. They contend that because not all owners of real estate in the City suffer the burden of the payroll tax, the substitution of tax revenue derived from the payroll tax violates the constitutional mandate of uniformity in real estate taxation.

Plaintiffs cite no authority for the position that the Uniformity Clause limits the State's ability to delegate authority to the City to raise revenue for its own school district through a payroll tax on businesses operating within it. Instead, in the context of school funding, the Court has suggested the contrary:

> [T]he tax clause was not intended to say that a State function may not be delegated to local government to be met by local taxation . . . . [L]ocal government is simply an arm of the State with respect to the many State functions which the State decides shall be performed through local government. The tax clause does not restrict the State with respect to that decision.
>
> [Robinson, 62 N.J. at 502.]

As a corollary argument, plaintiffs contend the payroll tax was a "surrogate" or "substitute" real estate tax precluded by the PILOT agreements.

A-3097-18

They similarly allege that the payroll tax unconstitutionally impaired their contract rights, noting "[t]he City did not reserve the right in the financial agreements entered into pursuant to the LTTEL to impose an additional financial burden" on them through the payroll tax.

The motion judge held the urban renewal entities failed to establish the PILOT payments were in lieu of anything other than property taxes collected from assessments on improvements to real property. Because the financial agreements had nothing to do with Jersey City's authority to impose the payroll tax, the judge reasoned there was no connection between the Ordinance and those financial agreements.

Plaintiffs have not pointed to any legal authority to support their claim that PILOT agreements immunize the contracting urban renewal entities from being subject to different, generally applicable taxes imposed, not on improvements to real estate, but on businesses. The LTTEL does not explicitly state or implicitly suggest that the "special financial agreements" authorized by the statute effect anything other than financial obligations in lieu of property taxes. Imposition of the payroll tax through enactment of the Ordinance did not inhibit in anyway the urban renewal entities from receiving the fruits of their financial agreements with the City.

A-3097-18

Plaintiffs also contend that the court erred by dismissing their complaint alleging that Article VIII, Section 2, Paragraph 8 of our Constitution prohibited collection of the payroll tax. The provision at issue, adopted in 2010, states:

> No contributions from employers, other than the State, or from employees of those employers, <u>collected by the State</u> entirely by means of an assessment exclusively on, or exclusively measured by, the wages or salaries paid by the employers to the employees . . . shall be used for any purpose other than providing and administering benefits to employees and their families or dependents . . . . All contributions <u>collected by the State</u> from any employer . . . shall be dedicated solely to the purpose of providing and administering [those] benefits . . . . No part of the contributions, interest or income shall be directly or indirectly transferred, borrowed, appropriated or used for any purpose other than providing and administering benefits pursuant to this paragraph.
>
> [<u>Ibid.</u> (emphasis added).]

The motion judge held this provision had no bearing on the payroll tax because by its plain language, it applied only to contributions collected "by the State," and not those collected by municipalities.

On appeal, plaintiffs claim the judge's analysis was "overly simplistic," because it failed to consider that Chapter 68 "authorize[d the] City to assist in the State's circumvention of its <u>Abbott</u> obligations." Stated differently,

A-3097-18

plaintiffs contend that the City is acting as an agent of the State; therefore, the payroll tax violated Article VIII, Section 2, Paragraph 8.

As already noted, we reject plaintiffs' claim that imposition of a payroll tax to supplement school funding violates our Constitution. More importantly, "[i]n ascertaining the intent of a constitutional provision, a court must first look to the precise language used by the drafters. If the language is clear and unambiguous, the words used must be given their plain meaning." State v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 527 (1999) (citing Gangemi v. Berry, 25 N.J. 1, 10 (1957)). We agree with the motion judge; the meaning of the provision at issue is plain, and the constitutional prohibition only applies to the State, not the City.

### III.

Plaintiffs contend the Ordinance is ultra vires because it exceeded the grant of legislative authority and was unconstitutionally vague. We disagree.

The motion judge held the Ordinance was not ultra vires because the Legislature had left municipalities with discretion to define the terms to be used in any ordinance. The judge found that the City reasonably incorporated several definitions from Newark's ordinance, which we upheld against constitutional challenge, and further that the City was entitled to latitude and deference in how it implemented the tax. On appeal, plaintiffs contend the

29                                                                              A-3097-18

Ordinance exceeded the scope of the LTAA in two respects: (1) the "supervisor provision" is so expansive that it includes employees who neither live nor work in Jersey City and may even be located in other countries; and (2) the Ordinance imposes penal consequences.

"[A] municipality is a creature of the Legislature, and as such is a government of enumerated powers which can act only by delegated authority." Inganamort v. Borough of Fort Lee, 72 N.J. 412, 417 (1977) (citing Giannone v. Carlin, 20 N.J. 511, 517 (1956)). "Any exercise of a delegated power by a municipality in a manner not within the purview of the governing statute is capricious and ultra vires of the delegated powers." Giannone, 20 N.J. at 517; accord Kress v. LaVilla, 335 N.J. Super. 400, 410 (App. Div. 2000). "Two forms of ultra vires acts exist under the law: ultra vires acts in the primary sense and ultra vires acts in the secondary sense." City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018).

"Ultra vires acts in the primary sense are 'act[s] utterly beyond the jurisdiction of a municipal corporation' and are void." Ibid. (alteration in original) (quoting Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown, 162 N.J. 361, 368 (2000)). "For a municipal decision or action to be considered ultra vires in the primary sense, the municipality must be 'utterly without capacity to perform the act or make the

appointment.'" Id. at 273 (quoting Maltese v. Twp. of N. Brunswick, 353 N.J. Super 226, 246 (App. Div. 2002)).

"In contrast, an ultra vires act in the secondary sense arises from the 'irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional.'" Id. at 272 (quoting Middletown Twp. Policemen's Benevolent Ass'n, 162 N.J. at 368). "[A]n act is ultra vires in the secondary sense when the action is generally within the power of the municipality but was carried out improperly or irregularly." Id. at 273.

Although the LTAA does not define "supervision," it does define "[p]ayroll" to mean "the total remuneration paid by employers to employees . . . for services . . . performed within the municipality; or . . . outside the municipality and the place from which the services are supervised, is in the municipality." N.J.S.A. 40:48C-14. The Ordinance adopted the same language and further provided that services should be considered to be "supervised from the City if an individual who either works in or is based in the City has the right to control and direct the manner of rendition of the [e]mployee's service, has hiring and firing responsibility and oversees the work of such employee." Jersey City, N.J., Code § 304-18. This additional language is clearly consistent with the common usage of the term "supervise"; plaintiffs have not demonstrated the definitional sections of the Ordinance

31

were outside "the purview of the governing statute" or "ultra vires of the delegated powers." Giannone, 20 N.J. at 517.

The LTAA states that "[a]ny ordinance adopted pursuant to this article shall," among other things, "[p]rovide methods for enforcement of, and for the imposition of penalties for failure to report and pay, the tax imposed," and shall "[p]rovide a procedure for claims for refunds, and repayment of overpayment of taxes." N.J.S.A. 40:48C-16(c) to (d). Consistent with this legislative mandate, the Ordinance imposes "penalties . . . of up to $2000, and the imposition of sentences of imprisonment or community service, neither of which can exceed ninety days." Jersey City, N.J., Code § 304-19.4(e). This is entirely consonant with the City's general police powers. N.J.S.A. 40:69A-29(b). Because the LTAA requires a municipality to adopt an enforcement mechanism, we fail to see how the Ordinance, which incorporates one, is ultra vires.

We also reject plaintiffs' contention that the Ordinance is unconstitutionally vague because it imposed "criminal consequences" for unintended misinterpretations of its provisions. "Vagueness challenges are . . . typically brought in contexts implicating the enforcement of criminal statutes, and are usually based on a contention that . . . no one should be prosecuted for violation of a statute, unless the statute provides adequate warning of the

proscribed behavior and sufficient guidance to . . . prevent arbitrary application[]" by law enforcement. <u>In re Loans of N.J. Prop. Liab. Ins. Guar. Ass'n</u>, 124 N.J. 69, 78 (1991).

By contrast, "civil statutes in general, and economic regulations in particular, are subject to less stringent scrutiny under the vagueness doctrine." <u>Ibid.</u>; <u>accord</u> <u>Visiting Homemaker Serv. of Hudson Cnty. v. Bd. of Chosen Freeholders of Hudson</u>, 380 N.J. Super. 596, 613 (App. Div. 2005). This is in part "because business entities can be expected to consult legislation considerations in advance of economic action." <u>Ibid.</u> "[A] commercial regulatory statute" will be "held unconstitutionally vague only if it is 'substantially incomprehensible.'" <u>In re Farmers' Mut. Fire Assurance Ass'n of N.J.</u>, 256 N.J. Super. 607, 619–20 (App. Div. 1992) (alteration in original) (quoting <u>In re Loans</u>, 124 N.J. at 78).

Here, the challenged provision of the Ordinance is § 304-19.4(e), which authorizes three potential penalties for failing to provide or file necessary records or for making a false report to "avoid the payment in whole or in part of the payroll tax." The penalties include a monetary fine, community service, and imprisonment up to ninety days. <u>Ibid.</u> The motion judge held that because the Ordinance included imprisonment as a potential penalty, it was "penal" in nature and therefore subject to stricter scrutiny than a civil statute. However,

33

because the payroll tax attached only to employees' salaries that are subject to federal tax withholding, and the Ordinance was consistent with the terms of the LTAA, it was not unconstitutionally vague.

"To avoid the pitfall of vagueness, a statute must enable a person of common intelligence to understand its essential terms." Farmers' Mut., 256 N.J. Super. at 619 (citing State v. Lashinsky, 81 N.J. 1, 17 (1979)). A statute is facially vague only if it is "'impermissibly vague in all its application,' that is, there is no conduct that it proscribes with sufficient certainty." State v. Cameron, 100 N.J. 586, 593 (1985) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

Plaintiffs' arguments fail to present any cogent reason why the motion judge's analysis was wrong. No further discussion is necessary. R. 2:11-3(e)(1)(E).

## IV.

Plaintiffs contend the Ordinance and Chapter 68 violate the federal Constitution's "Privileges and Immunities" (P&I) clause because "they discriminate against out-of-state residents by making it more expensive to employ them." The P&I clause states: "The [c]itizens of each State shall be

entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1 (emphasis added).[11]

It is settled law that only "citizens" may bring a claim for alleged violations of the P&I clause; corporations may not. See, e.g., Pembina Consol. Silver Mining & Milling Co. v. Pa., 125 U.S. 181, 187 (1888) ("Corporations are not citizens within the meaning of [the P & I] clause)."; accord Am. Trucking Ass'ns. v. Larson, 683 F.2d 787, 790 (3d Cir. 1982) (the term "citizen" in the P & I clause only applied to "natural persons" and barred a trucking association's claim); Am. Fire & Cas. Co. v. N.J. Div. of Tax'n, 375 N.J. Super. 434, 457 (App. Div. 2005) ("[C]orporations are not held to be 'persons' to which that clause applies."). The motion judge dismissed plaintiffs' P&I clause cause of action on these grounds, and, as to plaintiffs, Ivan Baron and Gary Wagner, who were "natural persons" employed by two company plaintiffs, the judge held the payroll "tax neither adversely affect[ed]" their tax liability "nor restrict[ed] their right to employment."

As to the plaintiffs who are not natural persons or labor unions, we agree entirely with the motion judge; they have no cognizable claim under the P&I clause. For the first time before us, plaintiffs contend in a footnote that they

---

[11] Plaintiffs do not rely on the separate "privileges and immunities" clause in the Fourteenth Amendment. U.S. Const. amend XIV, § 1.

are also representing the interests of "members of the public similarly situated" to Messrs. Baron and Wagner, and individual members of the union plaintiffs. We refuse to consider the argument. See Zaman v. Felton, 219 N.J. 199, 226–27 (2014) (refusing to consider a claim raised for the first time on appeal (citing State v. Robinson, 200 N.J. 1, 20 (2009))); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 155 (App. Div. 1997) (noting "the raising of additional legal issues by" footnotes is inappropriate).

As to the individual plaintiffs and labor unions, we affirm the dismissal of their P&I clause cause of action for several reasons. "[D]isadvantaged New Jersey residents have no claim under the Privileges and Immunities Clause." United Bldg. & Constr. Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 217 (1984) (citing Slaughter-House Cases, 83 U.S. 36, 77 (1873)); accord Taylor v. Rorke, 279 N.J. Super. 63, 68 (App. Div. 1995) (holding the P&I clause "prevents states from discriminating against out-of-state individuals" (citing Toomer v. Witsell, 334 U.S. 385, 395 (1948))). Thus, Wagner and the union members residing in New Jersey have no claim under the P&I clause.

The P&I clause protects non-New Jersey residents right to pursue their "livelihood free from economic discrimination." Salorio v. Glaser, 82 N.J. 482, 501 (1980). As the motion judge recognized, however, the payroll tax

36                                                                    A-3097-18

does not burden individual employees; employers are expressly prohibited from passing the burden onto their employees through deductions in salaries. N.J.S.A. 40:48-16(e). Thus, the Ordinance does not impose a "higher tax[] or imposition[]" on non-resident employees compared to resident employees. Id. at 502 (citing Austin v. New Hampshire, 420 U.S. 656, 661 (1975)).

Plaintiffs seemingly understand this shortcoming, because they contend employers are less likely to hire out-of-state residents because of the payroll tax, and therefore out-of-state residents are economically disadvantaged compared to New Jersey residents. However, that certainly is not borne out in Mr. Baron's case, nor is there any other proof for the proposition. Plaintiffs' P&I clause cause of action was properly dismissed.

V.

We address the most troublesome aspect of the appeal, i.e., whether Chapter 68, which permits adoption of an ordinance that excludes resident employees from the payroll calculation, and the Ordinance, which excludes Jersey City residents from the calculation, violate the Commerce Clause of the United States Constitution. If there is such a violation, we must also consider whether these provisions in the LTAA and the Ordinance may be severed.

Article I, Section 8, Clause 3 of the United States Constitution provides, in pertinent part, that Congress shall have power "[t]o regulate Commerce . . .

37

among the several States."  Historically, "removing state trade barriers was a principal reason for the adoption of the Constitution" which precluded the "notorious[ ] obstruct[ion]" that states had previously engaged in under the Articles of Confederation.  <u>Tennessee Wine & Spirits Retailers Ass'n v. Thomas</u>, __ U.S. __ , __ (2019), 139 S. Ct. 2449, 2460 (2019).  "The negative or dormant implication of the Commerce Clause prohibits state taxation . . . that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'"  <u>Gen. Motors Corp. v. Tracy</u>, 519 U.S. 278, 287 (1997) (alteration in the original) (quoting <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 437 (1980)).  "This 'negative' aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures <u>designed to benefit in-state economic interests by burdening out-of-state competitors</u>."  <u>New Energy Co. v. Limbach</u>, 486 U.S. 269, 273 (1988) (emphasis added).

> The United States Supreme Court has set forth a four-part test in determining whether a tax can be sustained against a Commerce Clause challenge:  whether the tax (1) is applied to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state.

> [Stryker Corp. v. Dir., Div. of Taxation, 168 N.J. 138,
> 152 (2001) (citing Complete Auto Transit, Inc. v.
> Brady, 430 U.S. 274, 282 (1977))].[12]

Plaintiffs do not assert Chapter 68 or the Ordinance fail the first prong of the Complete Auto test, and the argument regarding prong four is limited to a single sentence and accompanying footnote.[13] We, therefore, focus on plaintiffs' challenges under prongs two and three of the Complete Auto test. We do so in reverse order because "the first step in analyzing any law . . . under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce[] or discriminates against interstate commerce.'" Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or., 511 U.S. 93, 99 (1994) (quoting Hughes v. Oklahoma, 441 U.S. 322, 336 (1979)).

The motion judge concluded that plaintiffs failed to meet their burden of establishing prong three of the Complete Auto test, in part because plaintiffs conceded the tax only "indirectly violated" the dormant Commerce Clause, and

---

[12] We hereafter refer to these as the four prongs of the Complete Auto test.

[13] In Telebright Corp. v. Director, New Jersey Division of Taxation, we refused to consider a taxpayer's Commerce Clause challenge to the Corporation Business Tax Act as to three prongs of the Complete Auto test because its brief addressed the issues in "one sentence in the conclusion section" and "present[ed] no arguments in support of its contention." 424 N.J. Super. 384, 393 (App. Div. 2012).

precedent required a "<u>direct</u> burden or <u>direct</u> discrimination against interstate commerce," or an explicit "commercial advantage to local businesses." He further determined that plaintiffs "failed to make a competent showing of their economic loss attributable to the law, as well as a discriminatory effect on interstate commerce as a whole." The judge concluded the payroll tax did not facially discriminate against interstate commerce because it "applie[d] evenly to all businesses with employees in Jersey City regardless of whether the business [was] located inside or outside the City limits."

Before us, plaintiffs contend residency exemption provisions of Chapter 68 and the Ordinance are "per se invalid" because they favor "in-state 'economic interests' over out-of-state ones." As we understand the argument, plaintiffs claim businesses that hire non-resident employees are burdened with the payroll tax, whereas those who hire Jersey City residents are not, and because businesses in Jersey City are likely to draw employees from out-of-state, such as plaintiff Baron, the payroll tax violates the dormant Commerce Clause.

Discrimination claims under the dormant Commerce Clause require a two-step analysis. "'[D]iscrimination' simply means <u>differential treatment of in-state and out-of-state economic interests</u> that benefits the former and burdens the latter." <u>Or. Waste</u>, 511 U.S. at 99 (emphasis added). "[I]f a state

40

law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose.'" Tennessee Wine, ___ U.S. at ___, 139 S. Ct. at 2461 (alteration in original) (quoting Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008)).

However, "[w]here [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978) (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). "The crucial inquiry, therefore, must be directed to determining whether [the statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." Ibid.

Our Court has recognized that "'with respect to the discrimination prong of Complete Auto," a statute "is not facially discriminatory" if "[i]t does not differentiate between in-state and out-of-state businesses." Whirlpool, 208 N.J. at 174; accord Ampro Fisheries, Inc. v. Yaskin, 127 N.J. 602, 614 (1992) (concluding regulation limiting menhaden fishing did not place out-of-state

41

plaintiff "at a competitive disadvantage in relation to in-state fishing interests"). However, even if the statute does not directly regulate or discriminate against interstate commerce, it will be a per se violation of the Commerce Clause "when its effect is to favor in-state economic interests over out-of-state interests." Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986); see also, Trinova Corp. v. Mich. Dep't of Treasury, 498 U.S. 358, 385 (1991) ("The Commerce Clause requires more than mere facial neutrality.").

Chapter 68 permits, but does not require, that a municipality exclude its residents from the payroll calculation for tax purposes. The Ordinance incorporates this provision. The exclusion of Jersey City-resident employees applies equally, however, to all employers, whether located in Jersey City, elsewhere in New Jersey or in another state. Plaintiffs have failed to demonstrate, beyond mere conjecture, that the payroll tax as enacted burdens out-of-state-resident employees, i.e., that the Ordinance's effect burdens out-of-state economic interests. In this regard, the facts here are entirely distinguishable from those in Camps Newfound/Owatonna v. Town of Harrison, 520 U.S. 564 (1997), a case on which plaintiffs principally rely.

In that case, the plaintiff, a charitable organization which operated a summer camp to benefit children of the Christian Science faith, challenged a

A-3097-18

Maine statute that exempted such institutions from real estate and personal property taxes, but provided a limited or no tax exemption to those whose activities principally benefitted non-residents. Id. at 567–69. Ninety-five percent of the camp's attendees were not Maine residents. Id. at 581. The Court held that it was obvious from the "text of th[e] statute . . . that it discriminate[d] against interstate commerce." Id. at 575–76. Further, the Court held that although the tax was imposed on a Maine property holder, it was of no moment, because "the burden of Maine's facially discriminatory tax scheme falls by design in a predictably disproportionate way on out-of-staters." Id. at 579.

Here, the exclusion of Jersey City residents from the payroll tax calculation applies without respect to whether the employer is a resident of this state or another. Chapter 68 and the Ordinance do not, on their face, favor New Jersey's economic interests over another state's. Nor have plaintiffs demonstrated that the impact of the payroll tax as enacted was either intended to, or does, burden out-of-state residents. Chapter 68 and the Ordinance prohibit employers from collecting the tax from their employees, and the record lacks any proof that employers are or will be inhibited from hiring out-of-state residents because they will have to pay a tax on their salaries. We need not consider the second tier of the discrimination analysis in this case.

A-3097-18

Addressing the second, "fair apportionment" prong of the Complete Auto test, plaintiffs argue Chapter 68 and the Ordinance are neither internally nor externally consistent, because they "allow Jersey City to tax the payroll of people who work in other states . . . without any effort to ensure that it is taxing only economic value attributable to New Jersey." The motion judge found the payroll tax was internally consistent, noting that Newark had virtually the same ordinance that permitted employees who worked outside the city to be included in the computation if supervised from within the city. He noted that the LTAA and the Ordinance limited an employer's obligation to pay a payroll tax for a specific employee's wages only once, and that conflicts between municipalities were to be resolved by the Tax Court in accordance with the Ordinance.

"With regard to the second prong, there are two requirements to fair apportionment: internal consistency and external consistency." Whirlpool, 208 N.J. at 164. "The internal consistency analysis examines the hypothetical functioning of a tax formula, not its real[-]world effects on a taxpayer." Id. at 165 (citing Moorman Mfg. Co. v. Bair, 437 U.S. 267, 278–79 (1978)). "A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes" when "allowing such a tax in one State would place interstate commerce at the mercy of those remaining

44

States that might impose an identical tax." Okla. Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 185 (1995); accord Whirlpool, 208 N.J. at 165. "To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result." Goldberg v. Sweet, 488 U.S. 252, 261 (1989) (citing Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169 (1983)).

The LTAA provides for resolution of tax disputes whenever an employer is assessed more than one payroll tax on a specific employee. N.J.S.A. 40:48C-18. However, neither the statute nor the Ordinance provide a mechanism to resolve disputes if two taxing entities, in different states, impose a payroll tax on the same employee. The violation of the dormant Commerce Clause in such circumstances is obvious. A simple hypothetical better expresses the problem.

If a non-Jersey City resident employee of a company works in Manhattan but is supervised by the company's Jersey City-based supervisor, the Ordinance imposes a tax on the company for that employee. The LTAA permits the City to do so. See N.J.S.A. 40:48C-14(b) (including with the definition of "[p]ayroll" the amount of compensation paid to an employee whose services are provided outside the municipality but are supervised from

within the municipality).[14]  If New York City, for example, were to impose a payroll tax on the company for that same employee, the supervisor provision of the LTAA as incorporated in the Ordinance would be internally inconsistent, i.e., both states' identical taxes would result in multiple taxation of that employee's services.  Goldberg, 488 U.S. at 261.  Because an internally inconsistent tax is, by definition, not fairly apportioned, Whirlpool, 208 N.J. at 164, we need not address whether the LTAA and the Ordinance are externally inconsistent before concluding that the payroll tax as enacted fails to satisfy prong two of the Complete Auto test.  What then is the appropriate remedy?

"[A] challenged statute will be construed to avoid constitutional defects if the statute is 'reasonably susceptible' of such construction."  N.J. State Bd. of Higher Educ. v. Bd. of Dirs. of Shelton Coll., 90 N.J. 470, 478 (1982) (quoting State v. Profaci, 56 N.J. 346, 350 (1970)); accord Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 366 (2007).  The question becomes "whether a construction of the statute is possible that avoids the constitutional problem."  Whirlpool, 208 N.J. at 172 (citing State v. Miller, 170 N.J. 417, 433 (2002)).  "When a statute's constitutionality is doubtful, a court has the power to engage in 'judicial surgery' and through appropriate construction restore the

---

[14]    We refer to these portions of the Ordinance and the LTAA as the "supervisor provisions."

statute to health." Town Tobacconist v. Kimmelman, 94 N.J. 85, 104 (1983) (quoting N.J. State Chamber of Com. v. N.J. Election Law Enf't Comm'n, 82 N.J. 57, 75 (1980)).

In Whirlpool, the Court limited the reach of New Jersey's "Throw-Out Rule," a provision of the Corporate Business Tax used to apportion a multi-state corporation's local taxable income. 208 N.J. at 150–51. By throwing out a company's receipts that were untaxed by other states, the Throw-Out Rule resulted in an apportionment formula that increased the taxpayer's New Jersey tax liability. Id. at 151. The Court concluded,

> that the [Rule] may operate constitutionally . . . when applied to untaxed receipts from those states that lack jurisdiction to tax the corporate taxpayer due to the insufficient business activity in that state, but not when applied to receipts that are untaxed due to a state's determination not to have an income or similar business activity tax.
>
> [Ibid.]

"Faced with a tax formula that predictably operate[d] unconstitutionally in some circumstances, [the Court] . . . interpret[ed] the statute narrowly so that it generally operate[d] constitutionally." Id. at 173. The Court further found that such limited construction was consistent with the legislative history of the provision. Ibid.

A-3097-18

Here, the LTAA and the Ordinance could operate constitutionally if both provided a mechanism to ensure internal consistency in application of a payroll tax, i.e., that both provided a procedure and remedy for an aggrieved taxpayer to demonstrate it was being taxed twice for the same employee by application of the supervisor provisions. Certainly, the Legislature intended such a result. See N.J.S.A. 40:48C-18 (providing that no employer would be subject to more than one municipality for the remuneration paid to a particular employee). However, we are reluctant to order a specific remedy at this time.

"[A] State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination." McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, 496 U.S. 18, 39–40 (1990); see also Tyler Pipe Indus., Inc. v. Wash. State Dep't. of Rev., 483 U.S. 232, 252–53 (1987) (noting that whenever a tax fails the internal consistency test, it is generally left to the taxing authority to determine the exact remedy that must be provided to aggrieved taxpayers). Often, determining what is the most appropriate remedy to cure the constitutional infirmity "may necessitate more of a record" than exists. Id. at 252 (quoting Bacchus Imps., Ltd. v. Dias, 468 U.S. 263, 277 (1984)).

The lack of a complete record in this case is obvious. We have no idea whether plaintiff-businesses and other Jersey City employers actually face

48                                                                    A-3097-18

double taxation. We also do not know whether the State or the City, faced with the prospect of our holding, would fashion another remedy, including, possibly striking the supervisor provisions entirely. To be clear, the supervisor provisions of the LTAA and the Ordinance, left as enacted without limitations, violate the second prong of the Complete Auto test, and, therefore, violate the dormant Commerce Clause of the United States Constitution. We therefore vacate the dismissal of plaintiffs' Commerce Clause cause of action as it pertains to the supervisor provisions, remand the matter to the trial court to permit the parties to supplement the record and for any further proceedings consistent with this opinion.

VI.

Plaintiffs contend the judge misapplied the standard for deciding a motion to dismiss and placed a burden on plaintiffs to produce evidence proving allegations of the impact of the payroll tax on their business operations. The argument is meritless.

With the consent of all parties, the judge entertained oral argument on plaintiffs' motion for summary judgment and defendants' motion to dismiss with the common understanding that the court would issue dispositive rulings on all issues because there were no facts in dispute bearing on the legal

49

arguments. For example, in colloquy with the judge prior to oral argument, plaintiffs' counsel unequivocally stated that the facial constitutional challenges were ripe for adjudication, there were no real facts in dispute, and the "timing" was right for a decision "on the merits today."

We agree with the State and the City that plaintiffs' now object to a procedure they invited. See Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996) ("The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error.").

Lastly, we agree with plaintiffs that, to the extent he did, it was error for the judge to premise dismissal of their complaint upon the failure to join Newark as an indispensable party. "[A]bsence of an indispensable party does not deprive the court of jurisdiction to adjudicate the issues among the parties who were joined." Toll Bros. v. Twp. of W. Windsor, 334 N.J. Super. 77, 91 (App. Div. 2000) (citing Raynor v. Raynor, 319 N.J. Super. 132, 144 (App. Div. 1998)); accord In re Adoption of N.J.A.C. 19:3, 19:4, 19:5 & 19:6, 393 N.J. Super. 173, 186 (App. Div. 2007).

Read together, Rules 4:28-1(a) and 4:30 grant courts authority on their own motion to join indispensable parties when "in the person's absence

A-3097-18

complete relief cannot be accorded."  But, these rules do not provide for dismissal of a complaint on the merits for failure to join an indispensable party unless it has been established that the party at issue "cannot be served with process."  R. 4:28-1(b).  Nevertheless, we granted Newark's motion to intervene on appeal, it has addressed plaintiffs' arguments, and, to the extent there was any error, the issue is moot.

Affirmed in part; vacated in part; remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

Further, we stay our judgment for forty-five days to permit the parties to seek further review.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION